IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**CONOCOPHILLIPS COMPANY,**

    **Plaintiff,**

**v.**

**SARAH ROFFEY JEWELL,**
**SECRETARY OF THE INTERIOR,**

**GREGORY J. GOULD,**            NO. _____
**DIRECTOR, OFFICE OF**
**NATURAL RESOURCES REVENUE,**

**OFFICE OF NATURAL RESOURCES**
**REVENUE, and**

**UNITED STATES DEPARTMENT OF**
**THE INTERIOR,**

    **Defendants.**

## COMPLAINT AND PETITION FOR REVIEW OF FINAL DECISION OF INTERIOR BOARD OF LAND APPEALS

Plaintiff ConocoPhillips Company ("COP") seeks judicial review of a final agency action of the United States Department of the Interior, Office of Natural Resources Revenue and its predecessor agency the Minerals Management Service (referred to collectively as "ONRR"). ONRR has violated its own product valuation regulations and the terms of COP's oil and gas leases, which ONRR administers, by ordering COP to pay costs of placing natural gas production in "marketable condition" more than once in calculating royalties owed to the government. The regulations require COP, at no cost to the government, to place its federal lease gas production in marketable condition; but not more than once.

COP has exhausted its administrative remedies by obtaining a final decision of the Interior Board of Land Appeals ("IBLA") upholding ONRR's unlawful order. As a further basis for its claims against ONRR, COP alleges the following:

## Parties

1. ***ConocoPhillips Company.*** Plaintiff COP is a wholly-owned subsidiary of ConocoPhillips, a publicly traded corporation, incorporated in the State of Delaware, with its headquarters and principal place of business in Houston, Texas. COP explores for, develops, and produces crude oil and natural gas. As a holder of federal oil and natural gas leases in New Mexico at issue in this matter, COP is subject to regulation and enforcement by Defendants. COP will be harmed by enforcement of ONRR's improper and unlawful Order to Perform Restructured Accounting and Pay Additional Royalties ("Order to Pay") described below.

2. ***Secretary Sarah Roffey Jewell.*** Defendant Sarah Roffey Jewell is the Secretary of the Interior. Secretary Jewell is sued solely in her official capacity. Her office is at 1849 C Street N.W., Washington, DC 20240. Her governmental activities occur nationwide.

3. ***Director Gregory J. Gould.*** Defendant Gregory J. Gould is the Director of ONRR. Director Gould is sued solely in his official capacity. His office is at 1849 C Street N.W., Washington, DC 20240. His governmental activities occur nationwide.

4. ***Office of Natural Resources Revenue.*** Defendant ONRR is a division of DOI. ONRR is an agency of the United States, and is designated by the Secretary of the Interior to collect, disburse, and verify Federal energy and natural resource revenues. Where appropriate in this Complaint, "ONRR" also refers to ONRR's predecessor agency, the Mineral Management Service. ONRR's headquarters and principal place of business are located at 1849 C Street Northwest, Washington, D.C. 20240. Its governmental activities occur nationwide.

5.     *United States Department of the Interior.*  Defendant DOI is a department of the United States and, among other things, is responsible for administering oil and natural gas leases. Its headquarters and principal place of business are located at 1849 C Street Northwest, Washington, DC 20240.  Its governmental activities occur nationwide.

6.     All of ONRR's actions described herein were taken under authority delegated by Congress to Secretary Jewell and re-delegated by her to Director Gould.  *See* 30 U.S.C §§ 1711, 1751; 30 C.F.R. § 1201.100; Secretary of Interior Order No. 3299 § 5 (May 19, 2010); Secretary of Interior Order No. 3306 (Sep. 30, 2010).

## Jurisdiction & Venue

7.     This action concerns an alleged undervaluation by COP of royalties owed pursuant to its federal lease obligations.  More specifically, this action follows the entry by ONRR's predecessor, the Minerals Management Service, of an Order to Pay dated November 3, 2009, and subsequently styled as matter MMS-09-0104-O&G.  The Order to Pay addresses a time period from September 1, 2002 through December 31, 2007.

8.     COP timely filed a Notice of Appeal and supporting Statement of Reasons ("SOR") with respect to the Order to Pay on December 9, 2009, and by consent submitted supplemental SORs on August 27, 2010 and May 31, 2012.  On June 20, 2013, ONRR issued a decision granting in part and denying in part COP's appeal.

9.     COP timely appealed ONRR's decision denying the appeal to the Interior Board of Land Appeals ("IBLA") on July 31, 2013, providing an SOR and supplemental SOR.  IBLA redesignated the dispute as IBLA 2013-211.  IBLA issued a decision on July 13, 2015 affirming ONRR's decision, attached hereto as Exhibit 1-1.  COP moved for reconsideration, which IBLA denied on December 2, 2015.  *See* Exhibit 1-2.

10. This action for judicial review of the IBLA's final decision is filed pursuant to 30 U.S.C. § 1724(j), which permits commencement of judicial review within 180 days from receipt of notice by lessee of a final agency action. The filing of this action is supported by the judicial review provisions of the Administrative Procedures Act, 5 U.S.C. § 704.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331(a). Pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706, an actual controversy exists between defendants and COP concerning the meaning of regulations that govern the valuation of natural gas produced from federal leases.

12. Secretary Jewell and Director Gould in their official capacity and DOI and ONRR are proper defendants in this action pursuant to 5 U.S.C. § 703.

13. Venue is proper pursuant to 28 U.S.C 1391(b) because a substantial part of the events giving rise to the claim occurred in New Mexico, the leased lands and gas production operations are located in New Mexico, and the original audit at issue occurred there. ONRR has an office located at 6251 College Boulevard, Suite B, Farmington, New Mexico.

**Factual Background**

14. COP is a federal lessee and operator of multiple productive natural gas wells at issue in the Order to Pay in the San Juan Basin, New Mexico. During the relevant time period, the gas produced from these federal leases was transported via the San Juan Gathering System from twenty to fifty miles to the San Juan Processing Plant ("Plant"). The San Juan Gathering System is owned by Enterprise Field Service, LLC ("Enterprise"). The record before ONRR and the IBLA shows that gas left the leases under low pressure and needed to be compressed by Enterprise (using what is referred to in the record as the "Global Compression" system) in order

to be transported to the Plant, where it had to be compressed again to replace the compression lost during transportation and to prepare the gas for processing.

15. As explained below, the record shows the Plant uses a modern cryogenic expansion method for processing. As part of the technical function of the Plant, the gas needed to be further compressed at the inlet of the Plant and recompressed at the Plant tailgate. The transported gas was high Btu gas, suitable for processing to remove entrained natural gas liquids ("NGLs"). The Plant used the cryogenic process to extract entrained NGLs from the transported gas, leaving a volume of "residue" gas (methane) that was either sold at the Plant tailgate or transported on a mainline pipeline at the Plant tailgate to be sold.

16. For the cryogenic expander technology to work, the gas needed to begin the process at a very high pressure, 900 pounds per square inch ("psi"), which pressure the record shows was more than sufficient to place the gas in marketable condition. The cryogenic process then required a substantial drop in gas pressure to create extremely cold temperatures (-145°F) necessary to recover NGLs. This pressure drop is achieved by an expansion of the gas that reduced its pressure to approximately 350 psi. Frozen liquids are separated from the decompressed gas.

17. Recompression, or "boosting," of the residue gas is an integral part of the cryogenic expander technology. The record shows that the Plant could not function without recompression. Without a recompressor, a pressure drop would not exist in a cryogenic plant, gas would not flow through the plant, temperature reduction would not occur and NGLs would not be recovered. Indeed, when starting up a cryogenic plant, the idled plant is pressured and NGL processing is initiated by starting the recompressor, which causes the gas to flow through the plant and causes the pressure drop downstream of the expander. The recompressor generally

restores the gas pressure to a level it had been at the start of the cycle. Turning off the recompressor terminates NGL extraction. Only in a cryogenic-type plant is gas recompression (or "boosting") part of the plant's function. In all other types of plants, gas pressure is virtually unchanged by the processing technology.

18. The record shows that the gas at issue in the Order to Pay, which began processing at the plant inlet at 900 psi, was recompressed, or "boosted," at the plant tailgate to approximately 850 psi, which was the pressure needed to enter either the El Paso Natural Gas or Transwestern mainline pipeline systems for downstream transport and eventual sale.

19. Cryogenic expansion plants are generally more efficient than other types of processing plants, which creates net benefits to the lessor by yielding higher NGL recovery and thus higher royalty payments. Unlike other types of processing plants, however, cryogenic plants depend on decompression and subsequent recompression of the inlet gas to function. Denying a processing allowance for costs of recompression (boosting) punishes lessees for using a more efficient technology and, as shown below, is contrary to ONRR regulations.

20. ONRR (and predecessor MMS) took a position in the Order to Pay that, contrary to its valuation regulations, plant tailgate compression (or boosting) costs are *never* deductible from royalties, even when gas is already compressed at no cost to the government to a pressure needed to be in marketable condition before the start of the cryogenic process. Thus, according to ONRR, even if a lessee were to bear all of the costs of placing gas in marketable condition prior to processing, the lessee must do so again at the plant tailgate at no cost to the lessor.

21. In its royalty calculations, however, COP had segregated the plant tailgate recompression costs from the other costs of plant processing (this segregation is known as "unbundling"), and did not deduct these costs in its royalty calculations. Nevertheless, in

connection with the COP Order to Pay, even though COP did not deduct "boosting" costs, ONRR took the further position that no costs of compression could be deducted as part of either a transportation or processing allowance until the gas was "first" placed in marketable condition. In other words, ONRR decided the gas needed to be fully compressed to a level needed to meet mainline pipeline pressure before any compression costs could be deducted.  But, as explained in the record and as set forth herein, in order for gas to be processed in a cryogenic plant, the gas must be fully compressed in order to then be decompressed and recompressed as part of the cryogenic technical process.  By requiring that gas be fully compressed "first" before any cost deductions can occur, and at the same time requiring that recompression or boosting costs at the tailgate of a cryogenic plant are never deductible, ONRR effectively has required COP to place the gas in marketable condition twice, which is clearly contrary to the regulations and COP's lease terms.

22.    As noted, COP unbundled its Plant tailgate boosting costs and did not deduct them from royalties.   Because, however, COP did deduct costs incurred in the Global Compression System upstream of the Plant as a transportation allowance, ONRR took the position that all of the costs of the Global Compression system were nondeductible because those costs were incurred before the gas was sufficiently compressed to be in marketable condition. Compounding this error, ONRR also disallowed a transportation deduction for transporting gas on an additional 50 miles of pipe that was included in the global compression fees charged by Enterprise.  Nowhere in ONRR's regulations (or unbundling guidance documents) is it suggested that pipe used for transportation purposes is disallowed as a cost of placing the gas in marketable condition, but that is exactly what ONRR did by disallowing 100% of the global compression fee.

23. The Order to Pay states that "global compression is one of the first steps towards placing production in marketable condition," and "costs to place gas in marketable condition; specifically the global compression is disallowed." (Order to Pay at 3-4.) ONRR's position that all Global Compression system costs (which include a charge for transporting gas on 50 miles of pipe, unrelated to any compression charges) were nondeductible because gas must be fully compressed to a level needed to reach marketable condition "first" before any compression costs could be deducted, while at the same time disallowing compression costs after the gas was in marketable condition, is wrong as a matter of law. So too is ONRR wrong as a matter of law in its position that plant tailgate boosting costs in a cryogenic processing plant are never deductible, even when gas is in marketable condition prior to the cryogenic process. Yet the IBLA denied COP's appeal of these issues and agreed "with ONRR that the entire process of treating the gas once it leaves the wellhead, including compression in the field and during processing, ultimately served to render the gas from the wellhead marketable." (IBLA Decision at 10.) By requiring COP to bear all of the costs of compression upstream of the plant, under circumstances where COP did not deduct the plant tailgate boosting costs, and by requiring COP fully to incur transportation fees unrelated to compression, the Order to Pay unlawfully requires COP to overpay royalties.

**The Applicable Legal and Regulatory Framework**

24. Pursuant to ONRR's product valuation regulations, "[t]he lessee must place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government." 30 C.F.R. § 1206.153(i). "Marketable condition" means "lease products which are sufficiently free from impurities and otherwise in a condition that they

8

will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 1206.151.

25. The regulations allow lessees to deduct from royalties costs incurred to transport the gas in a pipeline, defined as "an allowance for the reasonable, actual costs of moving unprocessed gas, residue gas, or gas plant products to a point of sale or delivery off the lease . . . ." 30 C.F.R. § 1206.151. The regulations further provide that "Supplemental costs for compression—compression costs that are required for transportation and exceed those necessary to place gas in marketable condition—may be included when determining a transportation allowance." 30 C.F.R. § 1206.157(f)(9). Thus, the regulations expressly provide that a lessee is not required to bear costs of compression needed to put gas in marketable condition more than once at no cost to the government, and neither do they require that gas be placed in marketable condition first, before any supplemental compression used for transportation or processing purposes is allowed.

26. Part 1206 of the regulations also provides that "a deduction shall be allowed for the reasonable actual costs of processing" gas. 30 C.F.R. § 1206.158(a). Part 1206 permits deductions for recompression (or boosting) costs that are integral to processing, provided "no processing cost deduction shall be allowed for the costs of placing lease products in marketable condition." 30 C.F.R. § 1206.l58(d)(l).

27. ONRR bases its erroneous decision that plant tailgate "boosting" costs are never deductible even if gas has already been placed in marketable condition on 30 C.F.R. § 1202.151(b). This provision states, "[a] reasonable amount of residue gas shall be allowed royalty free for operation of the processing plant, but no allowance shall be made for boosting residue gas or other expenses *incidental to marketing, except as provided in 30 C.F.R. part*

9

*1206.*" *Id.* (emphasis added). But in asserting that booting costs are never deductible, ONRR completely ignores the provision's two express qualifications, "incidental to marketing" and "except as provided in 30 C.F.R. part 1206." As noted above, as long as gas already has been placed in marketable condition, "part 1206" provides that costs of boosting are allowed as a deduction when they are part of the "reasonable actual costs of processing." 30 C.F.R. § 1206.158(a).

28.    In sum, the record shows that in a cryogenic plant, in order for the gas to be decompressed during the cryogenic process, the gas must already be fully compressed (in marketable condition) to begin the process. Boosting in a cryogenic plant, which is needed for the cryogenic technology to function, essentially restores the gas (at least in part) to its original pressure effected at the plant inlet. A cryogenic processing plant cannot function without recompression (boosting); it is integral to the cryogenic technology. Thus, gas recompression or boosting costs in a cryogenic plant occur solely due to the type of processing technology used. Because recompression costs are purely a function of the cryogenic technology, and because the gas must begin the process in marketable condition, these costs are also not "incidental to marketing" within the meaning of 30 C.F.R. § 1202.151(b).

29.    ONRR ignores not only its own regulations, but also the case law. As a matter of law, a lessee is not "required to keep gas at the pressure needed to be in marketable condition throughout the process until it is delivered to a purchaser where the gas . . . loses pressure as it moves downstream." *Devon Energy Corp., Assistant Secretary's Valuation Determination for Coalbed Methane Production from the Kitty, Spotted Horse, and Rough Draw Fields, Powder River Basin, Wyoming,* at 30 (Oct. 9, 2003),[1] *aff'd., Devon Energy Corp. v. Kempthorne,* 551 F.3d 1030 (D.C. Cir. 2008) (*"Devon"*). "Thus, if compression is performed to move gas to [a

---

[1]    The October 9, 2003 Decision is attached hereto as Exhibit 1-3.

processing] plant because the plant is distant from the lease and is not otherwise a necessary component of bringing the gas to the relevant pipeline pressure, the costs of that compression would be allowed as a deduction." *Id.*

30. In addition, as a matter of law, "[w]here—and in how many phases or steps" a lessee chooses to account for pressure needed to reach marketable condition "is up to" the lessee. *Id.* at 29. ONRR's requirement that COP put gas into marketable condition "first" before it can take any deduction for compression costs is directly contradicted by the *Devon* decision, as well as the decisions in *Exxon Corp.*, 118 IBLA 221, (1991), *Phillips Petroleum Co*., 109 IBLA 4, (1989), *Shell Offshore, Inc.,* 142 IBLA 71 (1997), and *Mobil Producing Texas & New Mexico, Inc*., 115 IBLA 164, (1990). The Acting Assistant Secretary in *Devon*, affirmed by the D.C. Circuit, expressly allowed a deduction of costs of a major midstream compressor, for example, before the gas at issue had reached mainline pipeline pressure, while instead disallowing a deduction of costs of a smaller compressor further downstream that added the needed incremental level of mainline pipeline pressure to be in marketable condition. *Id.* at 31 n.25. Because COP incurred all Plant tailgate boosting costs at no cost to the government, and because 30 C.F.R. § 1206.157(f)(9) expressly allows COP to deduct supplemental compression costs in COP's transportation allowance, the Order to Pay requiring COP to incur all of the Global Compression system costs, including even separate transportation fees for 50 miles of pipeline transportation, is erroneous as a matter of law.

31. ONRR's Order to Pay is arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Insur. Co.*, 462 U.S. 29, 43 (1983).

**Claim for Declaratory Judgment**

32. All of the facts and allegations in the preceding paragraphs are incorporated below.

33. The Court should declare that ONRR acted arbitrarily, capriciously and not in accordance with law and, therefore, the Order to Pay is unlawful and invalid.

**Prayer for Relief**

WHEREFORE, COP prays that this Court:

A. Enter a declaratory judgment that the Order to Pay is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

B. Enter a declaratory judgment that ONRR may not prohibit COP from deducting Global Compression costs as a transportation allowance, or Plant compression costs as a processing allowance, that are not required to place gas in a marketable condition;

C. Enter a declaratory judgment that COP may choose "[w]here—and in how many phases or steps" in the Global Compression system or cryogenic processing Plant that it accounts for compression costs needed to place gas in marketable condition;

D. Enter a declaratory judgment that ONRR may not prohibit COP from deducting fees for transporting gas charged by Enterprise that are not related to compression costs as a transportation allowance.

E. Enjoin Defendants from enforcing the Order to Pay;

F. Award COP its reasonable attorneys' fees and permissible costs as permitted by 28 U.S.C. § 2412(b); and

G. Grant such other relief as may be appropriate under the circumstances.

Respectfully submitted,

HOLLAND & HART LLP

By _/s/ Robert J. Sutphin_
Robert J. Sutphin
Adam G. Rankin
110 North Guadalupe, Suite One
P.O. Box 2208
Santa Fe, New Mexico 87504-2208
TEL:   (505) 988-4421
FAX:   (505) 983-6043
rsutphin@hollandhart.com
agrankin@hollandhart.com

KING & SPALDING LLP
Charles J. (Tim) Engel
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 661-7800
tengel@kslaw.com
(Association of Out-of-State Counsel to be filed)

Erich Almonte
1100 Louisiana Street
Suite 4000
Houston, Texas 77002-5213
(713) 751-3200
(713) 751-3290 (facsimile)
ealmonte@kslaw.com
(Association of Out-of-State Counsel to be filed)

**Attorneys for ConocoPhillips Company**

8817326_1